Case No. 16-5238, Barbara Ann White v. Wal-Mart Stores Again, I ask both counsel to step up and introduce yourselves. Tell us who you represent, please. Good morning, Your Honor. Good morning, Your Honor. My name is Roy Amateur, A-M-A-T-O-R-E, and I represent the appellant, Barbara Ann White, who is the guardian of Michael White, Jr., a disabled person who was involved in this incident. And also? Good morning, Your Honors. I'm Elizabeth Bartolucci. I'm representing Wal-Mart Stores and Dorothy Sexton and Jennifer Lard, who are the defendant appellees. All right. Thank you, counsel. Ms. Bartolucci, when it's your turn, you're going to have to speak much louder than you just did. All right? And Mr. Amateur, you can stay up here, and we'll let you know that we'll give you about 15 minutes for each side for argument. In some cases, we have lots of questions. In other cases, we may not. We'll give you some time for rebuttal. And, again, as in the last case, Justice Harris is the third member of the panel. He will review the tape recordings that we sent to participate in our deliberations. May I ask Judge Dorman to reserve a bit of time, or is the court content? We're going to give you 15 to start and five to finish, unless things get unexpected. Thank you, Your Honor. I'm going to proceed by assuming that you're roughly familiar with the facts, as I know you are. But, briefly, this was an arrest and detention incident at the Walmart Stone Forest Park on March 10, 2012. Your Honor, I'm hoping that this process can clear up some confusion. And I say, without any hyperbole, that the plaintiff is generally confused as to how summary judgment or what the basis of it was in this case. The defendant's arguments below were that the plaintiff, Michael White, Jr., who is a, you can say a third grade level, but that's really stretching it. You could have a conversation with a third grader. You really can't have a conversation with my young Michael. I'm sorry to interrupt you right away. Please, Judge. Because as I read through all this, I realized he was adjudicated a disabled person. Yes. At the Circuit Court of Cook County. Yes, the probate court. Yeah. Do you know who the judge was that signed that order? Boy, I do not, Judge. I sat there for 15 years. But that was some time ago. Do you know the case number or how long he's been adjudicated? Boy, I know that I read that, but let me just briefly see if I've covered that. He was in his 20s, right? Yes. He's probably about 22 or 23, right? I know, but it depends. You're adjudicated at 18. You have to be re-adjudicated. Exactly. So I just want to make sure I didn't do it, is all I'm saying. Oh. So I need to get that information at some point. Boy, that's a tough one for me because that's going back. When I came into the case, he was already adjudicated. He wasn't adjudicated part and parcel of this case. No, no, no. I understand that. Yes. What we'll ask you to do, Ms. Dramatore, is after we're all done today, is simply file a statement with the clerk of the court through the filing system indicating the result of your research into that issue. And the issue, just to be clear, is the original adjudication. Who went where when? As an adult because he probably was adjudicated as a minor, and then there'd have to be a whole new adjudication once he turned 18. In order for this to be procedurally proper. Correct. So, very well. We're looking to file something. I'm saying I reviewed the court records and this is, it was entered by Judge Coughlin. And this is the case number or whatever. Very well. And I know that's been pled below what not in the complaint, actually. If counsel has the complaint, I'll bet we can get that information back. It's in the complaint? I believe we pled that he had been adjudicated, that he had been adjudicated, which he is the guardian pursuant to case number. Oh, yeah. Right here. 2011-P-293. All right. You may forget what I said about the filing the statement. Yeah, let me tell you. And you were already here. Dang it. I was already in this court. Oh, I understand your concern. I was not. Oh, I'm sorry. I wasn't following the drift. Yeah, I'm just concerned that I'm the one who signed the order, so you're absolutely right, Justice. I did not sign that order because I was sitting here at the time. That's right, Judge. So, no problem. All right. You don't need to do anything for it. Thank you. So I won't go ahead and do that. Thank you, Judge. Okay. The defendants moved below claiming that Michael was one of the family that was arrested that day, had no standing to sue. Why did he have no standing? Because he was never arrested. That's what the brief said below. So, you know, we were coming into this fighting against summary judgment with an argument that didn't make sense to us in the beginning. And obviously that's circular reason. Why does he have no standing? Because we didn't do anything to him. Well, that's their position. And the problem is you're suing under a whole wide theory of torts, but most of them have rather stringent requirements as to what the defendant needed to do to create, whether it's false imprisonment or emotional distress, et cetera. And it appears that the reason the circuit court went down the road it did and that Wal-Mart's position was that Michael, no one from Wal-Mart ever told Michael, you must stay here, you're not allowed to leave, you know, we're locking the door on you, anything like that. Now, the mother's a different story, but as to Michael. Right. All right. And that raises the question about, well, he's a disabled person, so would he be expected to have left on his own without mom? But is that a standing issue is what I'm just addressing initially. Is standing an issue now? No, I'm saying we answer a summary judgment motion below, and their argument was he lacks standing to sue. What is the argument? I know the order was entered on the summary judgment on January 20th, 2015. Was it argued the same day or came out later? I believe it was argued the same day. Our argument, I believe, was briefed, obviously, before that. Yeah. But the point is, we're coming into this having to argue what we thought was a nonsensical argument, that he lacks standing, and the reason he lacks standing, not that there's not a justiciable controversy here, or the elements of standing which are laid forth in my brief, but that he didn't do it. They didn't do nothing. So, therefore, obviously, that's not standing. That's what a trial is for. So, you know, we argued it on the facts. Yes, we treated it as if they were just saying that there's insufficient evidence to go forward. And so I'm just trying to say from the outset that there's confusion here because, obviously, it's not an issue of standing. Was there a basis given by the trial court for the? There was no basis given by the trial court. We asked for it. We were almost desperate for it, Judge. We didn't get it. We stepped up one morning, and the judge, we won't cast no aspersions to the honorable court, but the judge said to us from the bench, well, is this the case with the 15-minute detention? I said, well, no, Judge, I'm not sure where you're getting that. We're pre-trial staging. Maybe you have a complaint. But I said, no, Judge, it was a three, almost three-hour detention. It's not a 15-minute detention. And I believe it was at that hearing that he denied our motion to compel punitive damages, and we asked Judge, are you striking the prayer for punitive damages because we're entitled to a hearing under 219C or we're entitled to a hearing, excuse me, with regard to that. And then we formally asked for a hearing and said, Judge, you wouldn't give us period of damages. And so we were laboring under what we thought was extreme prejudice toward our client. And keep in mind, they only moved for summary judgment with regard to Michael. The grandmother was also arrested in this arrest everybody, hold everybody thing that went on there. But they never moved for summary judgment on her. But let me just say this, Judge, of course it was me. Yes. What's going on with all the rest of the defendants? Did you settle out, or what's happened? Settled. Okay. So the only thing that's left is Michael. That's right, Judge. You brought up punitive damages, all right? Well, there were two issues on appeal. Summary judgment was wrong, and why were we short-circuited on our, why were we denied a motion to compel asset discovery on the value of punitive damages? I was trying to ask a question. Yes, Judge. Why do you need an asset discovery hearing on Walmart, which is a publicly traded company? I mean, and the second part of the question is, if you don't have actual damages, punitive damages are off the table, aren't they? Sure. So if the court is granting summary judgment and or dismissing every remaining count as to Michael, punitive damages are no longer in play. Sure, but that came much later, Judge. The summary judgment all came much later. This was at the outset. All right. Then back to the first part of your question, why do you need a hearing on the asset discovery? We actually do have and did get their, whatever it was, their annual disclosures and all that. But it just, it makes proving those things so much easier, Judge. I don't have to call in, I don't have to call in somebody from, you know, from, you know, it just simply makes proving them. It's discovery. But really what the judge was telling us is, you're not getting, there ain't going to be no punitive damage coming here. That's what we thought. You're not getting any discovery out of it because there ain't going to be no punitive damage. You're dealing whatever the punitive damages might have been in your best case scenario, Walmart could have paid them. Oh, yes. Well, no question, Judge. But really, what we're arguing about is not so much a discovery evaluation, but he effectively shut down our punitive damages. Let me ask, I'm sorry. Go ahead. Let's talk about Michael. He's adjudicated a disabled person, correct? Correct. He's sitting there with his aunt and his mother. How many people were there altogether? Well, there was the aunt, Clara, who Michael was with. There's grandma. And then there's the daughter, Shannon, who chose not to participate. She's a student. She didn't want to come to court. She chose not to participate. Correct. But Clara's deposition. She said, they were told, nobody's leaving. That's right. Am I right? You can't leave. You were told you can't. She said, we were told we can't go anywhere by a number of people in a number of different times. Essentially this. Correct. And the mother's testimony, Mrs. White, she said in her death, they wouldn't let me and Mikey go. That was her testimony. Correct. She informed that Michael had a mental disability. The mother, did she not? She did. Yes. And that it was a developmental disability. That was her testimony in her deposition. And she said she had guardianship over him in her death. Correct? No, I don't believe she did. Oh, she didn't. My mistake. It may have been the mother. That's the mother. Okay. Who was not involved in the incident. The point I'm making is, people at this company were advised, there's a person here that has a disability of some type, and everyone else is telling them, stay here, don't go. Was there any allowance for, after they were advised of this disability, did anybody say, well, what's the problem? Or is he upset? Well, he was visibly upset. We imagine in her deposition testimony where he was crying and shaking. Correct. I don't think they got into it. I don't think there was any evidence that they made some formal look, he's got a disability. I really don't even remember that at all. I'm saying there was no inquiry into it even when they found out that he had a disability. No, there was no inquiry into it when he was leaving. Right. Even after they reviewed the tape, your Honor, when they saw she walked into the store with a sweater, she was there another hour and a half. So my point is, what do we know that's going on with this disabled person who's been adjudicated by the court as a disabled person as to his discomfort, his pain, his apprehension, his anxiety, or his shock of what's going on here? Do we know anything about what? Yes, we do. No. From Michael. Oh, no. Was his death called by the defendant? No. Are you interested in taking his deposition? Why? Because he's incompetent to testify. That's not true. Not necessarily. Well, I said probably. I don't know what they were thinking. I'm sorry. I don't know. But it was never pursued by them. Obviously, we're not going to take his death. Let's talk about the video. Not the video of the pink sweater being snatched or not snatched. Okay. But rather, the record seems to indicate that the circuit court made some or all of its decisions on the basis of the review of a video of the holding room, which showed that Michael was not shaking or crying in contradiction to some other testimony. The record we have does not have this video. That's right. And I disagree with that's what the court probably did. I think the court had a different line of thought. We'll have to guess. We'll have to guess. You're not getting my point. We don't have that video in this record. Well, you won't. That's true, Jack. It's not. It's not in this record. Whether he was crying or shaking, I claim, may be relevant to a period of damages aspect, but it is irrelevant to the basic argument we have, which is that we have witnesses that say that he was detained at the store. They claim we never wanted to detain him. We say, with all due respect to this August court and the trial court below, we don't want you to decide that question. We can make our claim. We don't have to prove our entire case. Now, we have to put forward some evidence that would show that if believed, would entitle us to judgment. They're the ones that have to show that their right to judgment is clear and free from doubt in order to avoid our right to a jury trial. What more do we have to do? We have competent witnesses saying, no, not only was he detained, the grandmother, I was also detained. And most importantly, because what I think as a judge, I think the judge thought, why did the grandma want to detain this kid? Why? Well, that's a great question. But when you answer that, you can also answer the question, why did they detain anybody for an hour and a half after they apologized to her for falsely arresting you? We apologize. It appears we falsely arrested you. But nobody's leaving because we haven't heard back from, we haven't heard back from loss prevention yet. And you need to sign some forms. It was only at midnight. It started around one o'clock. It was only at midnight that my client, Farrah, said that I'm calling the police. The police are going to come here. And they said, OK, OK, OK. First, she said, no, no, the caucus will handle this. We're handling this. Well, the question is not whether Walmart was a good host. The question is whether they committed these torts that are in the various counts. And before you run out of time, let me ask you to address, you're making an unusual request regarding counts 20 and 21, which is a spoliation. Yes. You're conceding the dismissal of count 20. But then you're saying, please send it back. And the question is, did you ask the circuit court to amend it to rectify what the circuit court felt might have been deficiencies in that main count? I'm thinking we did file a fourth amended complaint. I think these were the counts in the fourth amended complaint. Yes, Judge, yeah. And the court got rid of it. We never asked the trial. I can say definitively that we never asked the trial to consolidate or to consider those counts. But it should have done that automatically. It's just because I write something at the top of it doesn't control what the case law says. If the court dismisses a count, all right, you can't come to us and say we should have been given the leave to amend unless you asked in a certain court for leave to amend and gave a proposed amendment. We did. We did. We gave a proposed amendment complaint. But when we got dismissed again, when we got to the municipal division and got dismissed again, look, we were talking about going to trial on one of these counts and the rest of them because they never moved to dismiss. They were hanging out there. They didn't move to dismiss them. And so Judge Petters, in the municipal, he said, well, since Bob Day, I'm dismissing that for failing to sit across the regime, file an amended complaint. Well, okay, file an amended complaint. But then you opted to rest, didn't you? What we did is we opted to stand on that particular, we opted to stand on our negligence counts as pled. All right, and let me ask you also about the negligent hiring claims. The case law seems to indicate that you, you know, the employee's deficiencies, all right, as exhibited by the employee's history, have to be of such a nature that they would have necessarily caused the particular harm to your client. And we've got a person here, a woman employee with a spotty background. But what the circuit court seemed to indicate was, you know, just slurring at people and not using an unlawful use of a credit card didn't cause the harm to Michael. It's not the character of the kind of thing where they had, you know, maybe four or five or six incidents with exactly detaining the wrong people at the wrong time. Yes, sir. So how do we get around the elements of that? Stand on my briefs on that, Judge. It's really an ancillary claim to this. What I just can't get over is how some of the judgment is entered with live witnesses in an event that lasted three hours. And we have, you know, judges wearing robes deciding, no, I don't think that's what happened, or I don't know. What I think is that the trial court judge thought that why would they do this? And my answer to that, if that's what the trial court, you know, I can't say that that's what the trial court was thinking, but we're left to speculate. If the court said, well, it's ridiculous to think that they're arresting this kid, it's ridiculous to think they would arrest Grandma, too. They didn't do it for summary judgment on Grandma. It's ridiculous to think that after they saw the video, they wouldn't have just released all of them. What we have here is a case of over-detention based on CYA principles. Over-detention. We don't want to, we got to get some forms signed. They were pressuring them to sign forms, and they kept them there. And so no matter what anybody thinks of the original incident, there was a detention after the videotape was reviewed. Now, just so it doesn't, just lest I be criticized, I feel like. We have two minutes left. I have questions. Please, maybe I'm better at answering questions, but what I was going to do was review the hard testimony of detention. It is now left to a jury to decide. Okay. Counsel, I have two. The basis for the trial court in its ruling, it was Judge Callahan, right? Yes. On January 20th for dismissing all counts against the defendants relative to Michael Jr. What was the basis? With regard to summary judgment, we literally asked the court to the point of him being a little bit piqued with us for trying to get that answer. I believe we filed a second document saying, Judge, could you please put your answer in writing so we know the basis. Because for the life of me, I'm not being good for politics. I don't know. All right. I'm trying to get to this, though. Is there something in the record where there was argument on these specific motions as far as the summary judgment versus the counts against or that were in favor of Michael? Yes. I believe it was a part of the report of proceedings. And what you've got to direct me to the number in the record because I looked through C-TRAC and I could not find it. So I need that information also. So the judge did not rule on the day of the arguments. Did the judge rule sometime after that or was it the same day? I thought it was the same day. It's a long time ago. I understand. I just want to know if you know. I do think it was the same day. And then we subsequently asked for a written explanation or at least on the record, and the answer was denied. I mean, because I have the order in front of me, and it's all typed out already. Right. So it was handed to you that day. And if you don't remember, that's okay. It's not important. But what I'm saying is you say that there was argument on that day, and the ruling came that day. I'm not going to say that I know that for a fact. It seems to be my recollection. It seems to be my recollection perhaps there was a delay. I mean, it was a typed order. Okay. Something tells me the court typed that order. I know you left the bench and came back, so I was expecting to hear something. But we didn't hear anything. And, you know, I mean, if I were to ask, you know, I'm not presumptuous enough to ask questions with a panel in front of me, but if I were to ask, you know, what do you think might have been the basis for summary judgment, Paul, I sure hope you had an answer, because I honestly don't know. And we have live witnesses, and the family doesn't know. And I can't explain to them why. Okay. Thank you, Your Honor. Counsel. Thank you. But I think Justice Connors wants to start with the question. You've got to tell me, what was the basis for your motion for summary judgment? Your Honor, I think that I know the word standard was used in our motion, and I think that was the wrong choice of word. Yeah. I think that was the wrong choice of word. I think, and I go for the arguments that were subsequently made on the case law side and flushed this out, that what really was argued was that there was no duty alleged. There was no duty owed to a companion of a shoplifter. There was no recognized duty to companions of shoplifters in Illinois, other than perhaps much more in general duties owed under, say, the Premises Liability Act. But if a Walmart employee said to the companion, even as the companion is part of a group who is being addressed by the employee, you can't go anywhere, you being plural. Well, I think the one problem with that argument is that very quickly it was determined that Ms. Jericho had not stolen the sweater. How could they be there for three hours? Right, right. The evidence is undisputed that they looked at the video surveillance and said, okay, we see you didn't do it, and now they had this ridiculous paperwork day, which is inexcusable. I don't know why that happened, but is it a false arrest? The thing is, at that point, everybody, including Michael, he understood that. How do you know he understood anything? Well, you're correct. I can't assume that. But they said they wanted to arrest Auntie, so he didn't say they arrested Auntie. Oh, come on, Counsel. Right, okay. He's a disabled person. Okay. But he didn't say, oh, they're going to arrest Auntie. Right, and I won't purport to understand what Michael's understanding was, but he heard the words spoken to his aunt that we agree you didn't steal the sweater, and now there's this paperwork that has to be filled out. I mean, that means that he was in close proximity. And that he understood that? Well, I don't know if he understood it, but so let's go to the problem with that argument, which I think exists, which is that Mr. and his aunt was his guardian for those purposes for that moment. No, she wasn't. His mother was his guardian. It was a legal guardian, but I think, okay. She was a person that was with him at the time. No, it was his aunt. Clara. That's his aunt. Right. She was with him at the time. Right. In the parking lot. Right. So she was a person that the guardian allowed him to be with, but she's not a guardian. Okay. I shouldn't use the legal term loosely. Go ahead. I don't mean to imply she's the legal guardian. She was his companion. The adult was in charge of him at that moment at the store, and it was she who made the decisions once she was clear of the shoplifting. It was she who made the decisions to stay in the area. And, I mean, at that point, even as they entered the store, she acknowledged. She text messaged her mother and her niece telling them what was happening. At that juncture, I mean, I think that is the juncture where everything went downhill. She could have said, I mean, I don't know if this is the appropriate analogy, but I have thought maybe we should analogize Mecca to a child, and let's say this is a mother with her child. If you're detained for shoplifting and your mother and your niece are also in the store right at the cash registers and you are able to text message them, you text them and say, take the child. I have been detained for shoplifting. I think that's where everything is. So the duty is on the person who's being detained. Well, to a degree. To release Michael to another person. Well, the other option is to put a duty on a retailer to come up with solutions for what they're supposed to do if a shoplifter or a suspected shoplifter is in the store with someone else. Let me ask you a question. Say the shoplifter comes in and there was somebody in a wheelchair. All of a sudden just falls out. Do they have any responsibility to do anything? The people that say, stay, stay, you stay. You're all staying here. And the person is slumped over in their wheelchair. Is there any responsibility on the part of the retail person to do anything? Well, I think the duties that exist here are the well-expected duties under the premises laws of Illinois. There's a duty to exercise reasonable care regarding the condition of the premises and the extra emissions that occur there. So there is a duty of reasonable care to the premises, but Plank never alleged that. He made very, very detailed allegations in his complaint about how Walmart should have treated suspected shoplifters. Almost every single allegation of negligence in his negligence count, which, by the way, was made on behalf of all of the plaintiffs. Did he plead intentional and coercive emotional distress? Yes, he did. How does that end? Well, to have an intentional, first of all, you have to have extreme and outrageous conduct. And couldn't this have been extreme and outrageous? It's a disabled person who had no idea what was going on. He was afraid. He was shaking. But you never took his debt, did you? No, we did not. But how do we know? Well, that said, the plaintiff also could have produced an affidavit of Mike Goss. If he is competent to testify. You didn't take the debt. You didn't bother to take his deposition. I don't think it was a question of not bothering. I think the trial counsel who handled it was under the impression that he would be deemed not competent to testify. Probably erroneously, as you indicated, but I think that was probably why they didn't depose him. Well, then how could the trial court know all the facts of this situation? And to enter summary judgment on this case, not even knowing what Michael felt? Well, you're right. I think that goes to the question of his subjective feelings upon being treated a certain way. But before you get to his subjective feelings, you have to look at whether it's an objective standard. The case law says, and the case resetting says, this is an objective standard. It's not a subjective standard. So truly, Michael's feelings and reactions are not what the court should consider. The court should consider objectively whether this was an extreme and outrageous conduct. And I propose to you that a comparison with some of the extreme and outrageous conduct that's been found. I've read all those quotes, and I understand. This is a disabled person, is what I'm saying. It's just like the person in the wheelchair that's slumped over. What do we do? Is that experience outrageous to do nothing about that while you're telling them you're staying? Well, I think it's very distinguishable, though, from one other individual alone who's physically unable to move. Michael was physically able to move, and two other relatives were with him and were with that person. Did he want to get up on his own and leave? No. Instead of people telling him to stay there and leave his family? I'm not criticizing Michael's actions whatsoever. I would never purport to do that. You're putting the burden on him, are you not? No, I'm putting the burden on his aunt, rather than Walmart or retailer, to come up with solutions for every single possible scenario of shoppers and their companions that could be in the store. I think that's an extremely huge burden. Do they have any procedures for people that are blind or deaf or whatever? I don't know if they have specific procedures for shoplifter suspects and their companions. No. The shoplifter itself being blind or deaf. How do we communicate with these people? They're in whatever. I don't know. There are no procedures about anyone other than the reasonable man, the normal man that comes to the shop. I confess I don't know the answer to that. I'd be happy to submit a supplemental letter. I don't know if you'd like that. I don't know how they handle otherwise handicapped individuals. I do want to answer any other questions you have. There are 11 claims at issue here. They were all resolved various different ways. So I'm not going to propose to go through my brief and say everything. There are 11 counts, though, at issue in this appeal, are there? There are 11 counts. At issue in this appeal? Yes. So I know you don't want me to go through my brief and tell you why I think everything should be affirmed. What's the basis for Judge Callahan denying those or granting the summary judgment? Well, I think that's a good question I do want to get to. First of all, the burden is on the appellate in this situation to give you a record on which to fight error. Although you do have the de novo standard of review for the summary judgment ruling. So you can take a look at this record on your own and decide de novo whether the summary judgment was appropriate. And to answer your question, though, plaintiff did attend a hearing. He could have ordered a court recorder. After that, he could have ordered and prepared a vice judge's report. So I want you to tell me, what was the trial court's basis for the finding granting your motion for summary judgment? I do not know that. All I can say is we presume it was based on the arguments in the base. Okay. Thank you. Do you have any other questions, Your Honor? No further questions? No. Okay. So I'll just state the obvious, which is I think that the trial judge's decision has to be affirmed. Thank you. Mr. Amatore, five minutes for rebuttal. I don't think I need that much unless I have questions. I would like to say that, well, of course, we still don't know that nobody knows the basis of the court's, I believe there's a case law out there that says it's incumbent that the appellate court have to know what the trial court's basis is. Of course, you can review the whole record and find your own. The case law says we can affirm on any basis. Yes, of course, which I'm saying that I believe there is a, at least I was fortunate enough as far as the appellate court to let the trial court to let the appellate court know its basis. But once again, I don't mean to restrict this court. But may I just point out one thing? In the motion for summary judgment where the evidence was produced by the movement, there was no testimony produced from any of the people who were on the scene, from any of the guards, from any of the manager. So you don't have testimony on summary judgment saying we never wanted to arrest him. No, we just were concerned. We were concerned that we didn't want to let the kid go, you know, on his own, he was with his mom. There was, where was that testimony? All the depositions were taken. They never came out. If they're going to go for summary judgment and say we never meant to arrest him, you can't just rely on video footage to show that he wasn't handcuffed. And it hasn't been argued. We know that lack of physical restraints is not dispositive. But there was no guard's testimony. Oh, here's the other thing. The other thing is, you know, why didn't people come together and figure out a way of handling the disabled child? Well, for one thing, they were both, both arrested in the parking lot. From that point on, I think it's reasonable for Claire to say we've both been arrested. They're not letting us go. This has got to play out. She was under the impression that they were both arrested. She testified in deposition, did he just tell you to come in or did he tell you both to accompany the guard back in? And the answer was he told both of us we had to come with him. That's an arrest. There's never anybody walked up to anybody and said, look, we see that you've got a distressed child. He's not part of this. And the reason he couldn't be handed off to the other two family members who were there, because they, too, were arrested. And one of them got paid for it already. The other one chose not to participate in the litigation. But they, too, were under arrest. Nobody could leave. It was over-detention. In a way, I feel sorry for them. If they didn't use the F-word with my clients, I would feel a little bit sorry for them. But I feel, simply, it was clear they didn't know what to do. They didn't want to get in trouble. Just hold everybody until we get some guidance from above. Is it precise to say that they were arrested by a store security guard? Yes, I do. Or were they simply requested to remain or detained or something? You have to both come back in with us. This is a person wearing a security uniform. To me, that's an arrest. Okay? That's considered an arrest. I had to look that up once. But I say they were arrested. Not only did that happen in the parking lot, but they were put in a closed security office. They were guarded over. And they were told nobody is allowed to leave. They're respectful people. They're not going to go and testify. They're not going to go against security. We usually call it a Terry stop and not an arrest. Yes. But a traffic stop is an arrest. That is an out-and-out full-blown arrest. There's probable cause. There's probable cause for the Terry stop. Terry stop doesn't mean probable cause. The criminal case was an hour ago, so let's do it again. I'm sorry. You know, I've gone from serial to criminal, Judge. It's been a long time since I've stood here, and it's a thrill for me to do it. But I think, Judge, that on the basis that nobody in this room knows why summary judgement was entered, I think we need to go back and give this boy his day in court. Thank you, Judges. Thank you very much, Counsel. The matter will be taken under advisement. There are no further cases on the docket today, so court will be in recess. Thank you.